## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

RONDA KLASSEN,

       Plaintiff,                            Case No. 8:21-cv-761-MSS-TGW

       v.

ADVANCED MARKETING &
PROCESSING, INC. d/b/a PROTECT
MY CAR,

       Defendant.

_____/

## DEFENDANT'S OMNIBUS MOTION IN LIMINE
## AND INCORPORATED MEMORANDUM OF LAW

    Defendant ADVANCED MARKETING & PROCESSING, INC., d/b/a PROTECT MY CAR ("PMC" or "AM&P") submits this Omnibus Motion *in Limine* and requests that the Court enter an Order *in limine* excluding certain evidence, argument, questioning, or commentary by Plaintiff Ronda Klassen ("Plaintiff" or "Klassen"), Plaintiff's counsel, or any witness called by them to testify at trial.

## MEMORANDUM OF LAW

## I.    LEGAL STANDARD

    It is well recognized that the Court's inherent authority to manage the course of trial includes the power to determine the admissibility of evidence pursuant to a properly filed motion *in limine*. *See Soto v. Geico Indem. Co.*, No. 6:13-CV-181-ORL-40KR, 2014 WL 3644247, *2 (M.D. Fla. July 21, 2014). A motion *in limine* presents a pretrial issue of admissibility of evidence that is likely to arise at trial.

*Stewart v. Hooters of Am., Inc.,* No. 8:04–cv–40–T–17–MAP, 2007 WL 1752843, at *1 (M.D. Fla. June 18, 2007).  Its purpose is "to give the trial judge notice of the movant's position so as to avoid the introduction of damaging evidence which may irretrievably [a]ffect the fairness of the trial."  *Soto*, 2014 WL 3644247 at *2. Motions *in limine* also help streamline the trial process "by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Pandora Jewelers 1995 v. Pandora Jewelry, LLC,* 2011 WL 2295269, *1 (S.D. Fla. June 8, 2011).

## II.    MATTERS TO BE EXCLUDED

### A.    Evidence Relating to Alleged Misconduct by Persons or Entities Not Connected to the Calls or Klassen Lead

Plaintiff should be precluded from making any argument or eliciting evidence regarding other persons or companies that have nothing to do with this case as a substitute for evidence about New Level Media, DMS, or PMC.  Any such argument or evidence is inadmissible hearsay, irrelevant, and, even if (minimally) relevant, the probative value would be substantially outweighed by unfair prejudice, confusion of issues, and misleading the jury, among other things.

In her Motion for Summary Judgment, Plaintiff argued that it is "commonplace" in the telemarketing industry "for data-brokers and 'lead-generators' to sell consumer names and phone numbers to telemarketers with the false pretense that the consumers had consented or opted in to receive those calls,"

that is, to fabricate leads.  Dkt. No. 51 at 15.[1]  Plaintiff developed no evidence in this case to support such a theory.  Instead, Plaintiff premises this argument upon a complaint, two press releases, and a stipulated order from or regarding lawsuits brought by the Federal Trade Commission ("FTC") against various businesses purportedly for such conduct.  *See id.* at 15-16.  None of these businesses has anything to do with the telephone calls or Plaintiff's lead in this case, and none of the lawsuits was even brought under the TCPA (which the Federal Communications Commission, *not* the FTC, enforces).  *See*, *e.g.*, *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015); *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010).  Plaintiff plainly intends to make this argument at trial.  The two press releases – from November 1, 2016 and July 5, 2017 – are listed on Plaintiff's Exhibit List.  *See* Dkt. No. 81 at 10 (Exhibits P-20 and P-21).  True and correct copies are attached hereto as Exhibits A and B.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Evidence about persons and businesses from years earlier who have nothing to do with the facts of this case quite literally has **no** bearing on the claims or defenses.  This case involved a lead generated by New Level Media on particular website, and that lead was sold to

---

[1] PMC more specifically moves to preclude any such argument or evidence, which is based upon impermissible inferences from a subpoena response from Cox Communications, in item F below.

DMS, which sold the lead to PMC, which, based on that lead and its requirements and practices to obtain and use only valid consent-based leads, called Plaintiff. What the FTC alleged years ago against persons that have nothing to do with this case under laws other than the TCPA is plainly irrelevant and would not make any fact before the jury *about this case* more or less probable. *Cf. Chemoil Corp. v. MSA V*, No. 2:12-CV-472-FTM-99, 2013 WL 944949, *8 (M.D. Fla. Mar. 12, 2013) (excluding evidence of "Chemoil's determination regarding the credit worthiness of the nonparties King Williams and Direct Air" because it "is not relevant to the issues regarding the nonpayment of the Defendant Xtra's fuel uplifts"), *aff'd*,  2013 WL 3070853 (M.D. Fla. June 17, 2013).

Even if the argument or evidence regarding "data-brokers and 'lead generators'" that have nothing to do with the facts of this case were to be deemed relevant, it should still be excluded under Federal Rule of Evidence 403.  Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  There can be no question that arguments or evidence of this nature would be unfairly prejudicial, confuse the issues, mislead the jury, and waste time.  If any evidence about businesses that have nothing to do with this case is introduced to the jury, it would understandably confuse the jurors, and the invocation of the Federal Trade Commission could lead the jury to falsely conclude that PMC, New Level Media, or DMS may be under government investigation.

Moreover, nothing in the two press releases directly supports Plaintiff's unsupported "airport novel" speculation about a sinister operation to fabricate false leads.  *See* Exs. A & B.

This case is about six (or allegedly eight) telephone calls to Plaintiff.  Plaintiff should not be allowed to confuse and distract the jury with *alleged* bad actors in the telemarketing industry that have absolutely nothing to do with this case.  *Cf. Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2315077, *14 (S.D. Fla. May 11, 2020) (granting motion to exclude any evidence or reference to other litigation involving Coloplast or other manufacturers of female pelvic mesh slings" because such evidence has "no bona fide relevance to this case" and allegations by others "are inadmissible hearsay"); *Salinero v. Johnson & Johnson*, No. 1:18-CV-23643-UU, 2019 WL 7753445, *2–3 (S.D. Fla. Sept. 25, 2019) (excluding on these grounds evidence regarding claims or complaints about pelvic mesh products in general, whether against companies affiliated with defendant or not).

Finally, any evidence relating to persons not regarding the telephone calls and lead at issue in this case necessarily would be based upon inadmissible hearsay.  *See* Fed. R. Evid. 801(c) & 802.  Implicitly conceding that the complaint and court order she previously relied upon were plainly inadmissible, Plaintiff lists on her exhibit list only the two press releases from the FTC, which are indisputably out-of-court statements by the FTC about settlements of lawsuits it had filed under the Telemarketing Sales Rule and the Federal Trade Commission Act, and are thus inadmissible hearsay.  *See Johnson v. Ford Motor Co.*, 988 F.2d 573, 579–81 (5th

Cir. 1993) (excluding plaintiff's "summary of claims, lawsuits, and complaints" because they "amount[ ] to nothing more than a summary of allegations by others which constitute hearsay").

No exception applies to permit these press releases into evidence, including the public records exception. To qualify for that exception, under these circumstances, the release must set out "factual findings from a legally authorized investigation . . . ." Fed. R. Evid. 803(8)(A)(iii). There are no factual findings from a legally authorized investigation, only the description of a settlement and the allegations made in the underlying lawsuit, which plainly are not findings of fact. *See Williams v. Asplundh Tree Expert Co.*, No. 3:05-CV-479-J-33-MCR, 2006 WL 2868923, \*4 (M.D. Fla. Oct. 6, 2006) (holding the "Attorney General's memorandum is not admissible under this exception" because it "does not set forth factual findings as to the allegations").[2]

---

[2] *See also Africano v. Atrium Med. Corp.*, No. 17-CV-7238, 2021 WL 4477867, \*2 (N.D. Ill. Sept. 30, 2021) ("[O]bviously, a complaint contains mere allegations, not factual findings. The complaint thus is not admissible under the public records exception.") (internal citations omitted); *United States v. Klein*, No. 16-CR-442 (JMA), 2017 WL 1316999, \*3 (E.D.N.Y. Feb. 10, 2017) ("The Court is unaware . . . of any convincing authority in support of the proposition that 'factual findings' encompass an agency's allegations or charging decision in a parallel civil case."); *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 WL 10706086, \*5 (N.D. Ind. Oct. 28, 2016) ("As to the FTC's complaint against Simon, the Court is not persuaded that it is admissible as a public record or under the residual exception. The public records exception to the hearsay rule allows the admission into evidence of a record by a public office that sets out factual findings from a legally authorized investigation as long as there are not circumstances indicative of a lack of trustworthiness. However, Gumwood has not shown that the complaint represents factual findings from a legally authorized investigation; the allegations in the complaint are allegations, not findings. Thus, when used for the truth of the matters asserted, the allegations in the complaint constitute hearsay that do not meet any exception in and of themselves.").

**B.    Evidence or Argument About the Sufficiency of PMC's Disclosures and Discovery Responses**

During the discovery proceedings in this case, Plaintiff took issue with PMC's disclosures and discovery responses, including most recently a motion to strike the Declaration of Michael Perkins, a non-party witness outside PMC's control.  *See* Dkt. No. 61.  The Court should now preclude Plaintiff from making any argument concerning PMC's pre-trial disclosures or discovery responses or any discovery disputes because, as an initial matter, it would be irrelevant.

Plaintiff contends that PMC's purportedly inadequate disclosures regarding New Level Media, the operator of the website from which Ms. Klassen's lead originated, shows PMC's lack of familiarity with the direct sources of their leads if they are not the companies with which PMC directly deals, and that is relevant to PMC's safe harbor defense.  Nothing in the law supports that argument, and, indeed, nothing in the regulation specifying what constitutes the necessary "reasonable practices and procedures" touches upon that consideration.  *See* 47 U.S.C. § 227(c)(5)(C); 47 C.F.R. 64.1200(c)(2)(i) (specifying the "standards" that must be met to qualify for the safe harbor affirmative defense).  A direct relationship with the lead originator is not necessary.

Moreover, it is undisputed that while "[m]any of the leads are generated from websites run by companies, known as 'publishers,' that sell their leads to 'lead generators' or 'lead brokers,'" "***PMC does not deal with publishers***," and "directly deals" only with lead generators and lead brokers.  Dkt. No. 53 at ¶ 6

(emphasis added).  As PMC explained in the briefing on the motion to strike, "PMC did not learn about Mr. Perkins and his company until right near the end of the initial discovery period," "from counsel for DMS (the publicly-traded company that sold the lead containing Plaintiff's information to PMC) . . . ."  Dkt. No. 71 at 6-7. PMC's corporate representative flatly testified that PMC has no knowledge of New Level Media or Next Level Media (its prior name) outside of this litigation.  *See*. Plaintiff can seek to elicit that same testimony at trial without requiring the jury to wade through  discovery responses, disclosures, and disputes.

Even if argument or evidence about any discovery dispute were somehow relevant, its probative value would be substantially outweighed by undue prejudice, as it would greatly confuse the issues before the jury, who are there to decide facts, not compliance with discovery obligations under the Federal Rules of Civil Procedure.  *See* Fed. R. Evid. 402, 403.  As a general matter, a party's discovery conduct is not an appropriate consideration for a jury in reaching its verdict.  *Candy Craft Creations, LLC v. Gartner*, No. 2:12-CV-91, 2015 WL 6391202, *8 (S.D. Ga. Oct. 22, 2015) ("[T]here exists a significant probability that the jury would not merely use evidence that Defendants withheld documents during discovery to gauge Defendants' knowledge, intent, or bad faith, but also as an impetus to punish Defendants for conduct during the litigation.  Such punishment for litigation conduct is not within the purview of the jury and would constitute unfair prejudice to Defendants."), objections overruled, 2015 WL 7738069 (S.D. Ga. Dec. 1, 2015).

Courts therefore routinely exclude arguments concerning the pre-trial discovery process and any complaints about the sufficiency of a party's disclosures or responses or the need to engage in discovery motion practice.  *See Andrews v. Autoliv Japan, Ltd.*, No. 1:14-CV-3432-SCJ, 2021 WL 4093699, *1 (N.D. Ga. Jan. 20, 2021) ("[D]iscovery issues 'are irrelevant for purposes of trial.'").  To keep this trial about a few telephone calls on track, the Court should do the same here.

### C. Using the Terms "Willful(ly)" or "Knowing(ly)" to Describe the Alleged TCPA Violations to the Jury or Discussing in Front of the Jury Treble Damages Under the TCPA

Whether TCPA violations at issue in this case were committed willfully or knowingly (and consequently if damages should be increased up to three times) is a determination reserved for the Court, not the jury.  *See* 47 U.S.C. § 227(c)(5)(C) ("If ***the court*** finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, ***the court*** may, in its discretion, increase the amount of the award . . . .") (emphases added).  *See also Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 360 (E.D. Pa. 2019) ("The parties agreed that the Court should decide the only remaining issue, whether the violations of the TCPA and its regulations were willful and knowing, which the statute states is a matter for the court to determine."), *aff'd*, 805 F. App'x 156 (3d Cir. 2020); *Krakauer v. Dish Network L.L.C.*, No. 1:14-CV-333, 2017 WL 2242952 (M.D.N.C. May 22, 2017) (ruling by the court, following jury verdict, of willful and knowing violation of TCPA).  Accordingly, there is no basis to raise these issues in the presence of the jury because it would not be relevant to any of their

determinations, would lead to jury confusion, and would unfairly prejudice PMC.

**D.    Referring to Any of the Telephone Calls as "Robocalls" or "Automated Calls" or the Like and the Technology By Which They Were Placed, Including Plaintiff's Exhibit P-22**

This lawsuit involves only purported violations of the TCPA's national do-not-call rules set forth in 47 U.S.C. § 227(c) and the corresponding regulations.  It has nothing to do with other portions of the TCPA, including the portion of the TCPA that prohibits the making of telephone calls using an automatic telephone dialing system or prerecorded or artificial voices – commonly referred to as "robocalls" – under 47 U.S.C. § 227(b).  *See, e.g., Harrington v. RoundPoint Mortg. Servicing Corp.*, 163 F. Supp. 3d 1240, 1243 (M.D. Fla. 2016) (noting the differences between 47 U.S.C. § 227(b) and its "sister subsection," 47 U.S.C. § 227(c)).  *See also* https://www.merriam-webster.com/dictionary/robocall ("a telephone call from an automated source that delivers a prerecorded message to a large number of people").  And, indeed, there is no evidence that the telephone calls at issue involved any prerecorded or artificial voices or the use of an automatic telephone dialing system (or "autodialer").

This case therefore does not concern "robocalls" or "autodialers."  As the Supreme Court recently observed, "Americans passionately disagree about many things.  But they are largely united in their disdain for robocalls."  *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (U.S. 2020).  Thus, to prevent jury confusion as to the questions before it and to avoid unfair prejudice to PMC, any references or argument relating to the telephone calls at issue as involving or

being characterized as "robocalls," "autodialers," "automated calls," "robodialer," or the like, or references or argument as to the technology by which the telephone calls at issue were placed, should not be permitted.  For all these reasons, the Court should also exclude yet another press release from the FTC on Plaintiff's Exhibit List, a press release entitled "Hang up on auto warranty robocalls."  *See* Dkt. No. 81 at 10 (Exhibit P-22).  A true and correct copy is attached hereto as Exhibit C.  The "alert" about calls with "a recorded message" makes no mention of PMC and there is no evidence that any of the calls Plaintiff received were of the type described in the FTC's release.  And, again, the document is plainly inadmissible hearsay, as there are no factual findings, particularly with respect to the 47 visitor comments, something that further makes this document inadmissible under Fed. R. Evid. 403 because any minimal relevance (if any) would be substantially outweighed by unfair prejudice, confusion of issues, misleading the jury, and a waste of time.[3]

### E.   No Argument About a Duty to Investigate or Confirm Whether a Lead Actually Consented to Receive Calls

At various points, Plaintiff has suggested that PMC's alleged violation of the TCPA was willful and knowing, and preclusive of a safe harbor defense, because PMC should have taken "steps to assure Ronda Klassen actually consented to receive calls."  Dkt. No. 51 at 19.  Any such argument should be precluded at trial

---

[3] For the avoidance of doubt, this motion *in limine* would not preclude or require redaction of references to these terms if they already appear in otherwise admissible exhibits, such as the Doc Compton pamphlet entitled "Turning Robocalls Into Cash:  Stopping the Calls, and Making Them Pay!!!"

because there is no basis in the law for any duty or obligation of this sort, and it would confuse the jury by making them believe a higher standard of conduct applies than what is actually the case.

Plaintiff has repeatedly cited the FCC's language that "the TCPA places no affirmative obligation on a called party to opt out of calls to which he or she never consented; the TCPA places responsibility on the caller alone to ensure that he or she has valid consent for each call . . . ." *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 8004 (2015). Plaintiff conveniently ignores the next sentence: "A caller may rely on the valid consent of a consenting party until that consenting party revokes the consent and opts out of calls . . . ." *Id.* Plaintiff also ignores that the FCC had already ruled "that the TCPA does not prohibit a caller from obtaining consent through an intermediary," as opposed to directly from the called person. *In re GroupMe, Inc./Skype Commc'ns S.A.R.L. Petition*, 29 FCC Rcd. 3442, 3447 (2014).

There is simply no requirement, duty, or obligation under the TCPA for a caller who obtains what it believes to be valid, prior express written consent to confirm or check with the party to be called the validity of their consent. Indeed, Plaintiff has not proposed a jury instruction to this effect (because there is no basis or support for such an instruction). Plaintiff's counsel suggested to PMC's corporate representative at his deposition that PMC should have, before calling someone for whom it had already obtained a record of prior express written consent, "sen[t] a text and say, Are you interested in receiving calls about extended

warranties." Dkt. No. 64-3 at 88:3-89:5.  As there is no requirement to send such a text message, the decision to not send such a text message to a person for whom prior express written consent has already been obtained to confirm that consent (risking the very liability sought to be avoided) can hardly be probative of a knowing or willful violation, or somehow preclude a safe harbor defense.

The relevant consideration for the latter is whether the defendant "assumed, without reason, that Plaintiff consented to be called" or if it had reason for such a belief, such as "processes [to] ensure that it will not receive this information if consent is not first provided." *Johansen v. Efinancial LLC*, No. 2:20-CV-01351-RAJ-BAT, 2021 WL 7161969, *10 (W.D. Wash. June 11, 2021) ("*Johansen I*"), report and recommendation adopted, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022) ("*Johansen II*").  Where the defendant "could reasonably believe that Plaintiff submitted the form on [the] website and consented to be called because [the defendant] received verified information online which purported to be from and about Plaintiff." *Id.*  Especially in the absence of any red flags, it does not have to check or confirm for each (or any) lead that its processes worked.  "Thus, regardless of whether Plaintiff or a third party actor submitted the internet request, [the defendant] would be understandably mistaken in its belief that Plaintiff had consented to the call," which would fall "within the purview of the TCPA safe harbor provisions." *Johansen II*, 2022 WL 168170 at *6 (internal quotation omitted).

While Plaintiff and her counsel may think telemarketers should undertake

confirmatory efforts before calling persons they believe gave prior express written consent, there is no requirement or obligation or duty to do so under the TCPA, and as the failure to do so is not probative of a willful or knowing violation, nor does it preclude the safe harbor defense, such argument has no place in this trial and should be precluded.

### F.   Any Inferences or Argument Based Upon the Cox Communications Subpoena Response

At trial, Plaintiff intends on introducing Cox Communications' response to a subpoena that Plaintiff issued in this case.  *See* Dkt. No. 81 at 9 (Exhibit P-5).  A true and correct copy is attached hereto as Exhibit D.  Cox Communications' "Subpoena Response Team" provided Plaintiff with a record purporting to identify a subscriber associated with IP address 72.216.33.183 on February 28, 2020, the IP address associated with and date of the consent opt-in at issue in this case based on the Jornaya Report (the "Cox Record").  However, any inference or argument based solely on the Cox Record would be impermissible and inadmissible.

Plaintiff has not obtained, and has no intention of eliciting at trial, testimony from a Cox Communications employee or any expert witness to discuss or explain the Cox Record, how it was prepared and created, the data from which it is based, and how it is reliable evidence to permit any inference in support of Plaintiff's denial that she submitted the lead with her accurate information and prior express written consent to call her.[4]  Nor did Plaintiff pursue any evidence or testimony

---

[4] For example, internet service providers often use a method called network address translation ("NAT"), which has one public-facing IP address that is utilized by many users on a private

from Jornaya as to how it determined that IP address or location.  At the same time, Plaintiff seeks to broadly attack the reliability of such data in the telemarketing industry.  The Cox Record does not provide evidence of anything beyond what it states, certainly not support for the rank speculation that the IP address or stated location in the Jornaya Report is accurate and reliable (or how it was even determined), nor for Plaintiff's compounded speculation, for example, that the person identified in the Cox Record "was paid" to go on a website and take 98 seconds of his time "to enter" Plaintiff' personal information (name, address, telephone number, e-mail address) as well as the year, make, and model of the car that she owns, all which she agrees is accurate.  Dkt. No. 56 at 11 & 17-18; Dkt. No. 63 at ¶ 15; Dkt. No. 81 at 5, ¶ 15.

Accordingly, the Court should preclude any discussion, testimony, or argument about the Cox Record beyond its express contents.  Anything beyond that would require speculation, and there is no listed witness with personal knowledge of the Cox Record.  Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding

---

network, such as an internet service provider's.  "The majority of network address translators map multiple private hosts to one publicly exposed IP address. In a typical configuration, a local network uses one of the designated private IP address subnets (RFC 1918).  A router in that network has a private address of that address space.  The router is also connected to the Internet with a public address, typically assigned by an Internet service provider. As traffic passes from the local network to the Internet, the source address in each packet is translated on the fly from a private address to the public address. The router tracks basic data about each active connection (particularly the destination address and port). When a reply returns to the router, it uses the connection tracking data it stored during the outbound phase to determine the private address on the internal network to which to forward the reply."   https://en.wikipedia.org/wiki/ Network_address_translation.

that the witness has personal knowledge of the matter." Here, no witness at trial will have personal knowledge of the contents of the Cox Record and, accordingly, any testimony would amount to inadmissible speculation. *See United States v. Mancilla-Ibarra*, 947 F.3d 1343, 1351 (11th Cir. 2020); *Sowers v. R.J. Reynolds Tobacco Co.*, No. 3:09 C 11829, 2015 WL 12843904, *2 (M.D. Fla. Jan. 23, 2015).

Moreover, any explanation of the Cox Record or any vouching for its reliability would require technical knowledge within the scope of Federal Rule of Evidence 702, and thus could only come in through admissible expert opinion testimony. *See* Fed. R. Evid. 701(c); Fed. R. Evid. 702; *Gomez v. Gen. Nutrition Corp.*, 323 F. Supp. 3d 1368, 1378 (S.D. Fla. 2018). There is none in this case. As PMC argued in its summary judgment papers, the courts have "recognized that IP addresses can be unreliable indicators of physical location," (*Johansen I*, 2021 WL 7161969 at *8), and, in fact, publicly available information for that IP address connects it to locations in Fort Walton Beach, Florida, Pensacola, Florida, and even Atlanta, Georgia (about the same distance from Fort Walton Beach as Tampa). *See* Dkt. No. 53  at ¶¶ 29-30 & Dkt. No. 53-7. Such conflicting information "simply underscores the unreliability of IP addresses and provides no meaningful information about who submitted the online form . . . ." *Johansen I*, 2021 WL 7161969 at *8. *See also Johansen II*, 2022 WL 168170 at *5 (similar). Thus, at a minimum, any such argument or testimony about the meaning or implications or inferences from the Cox Record is necessarily "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," (Fed. R. Evid. 701(c)),

and without an expert witness, it cannot come in.

Likewise, Plaintiff's counsel should be precluded from making arguments about the Cox Record, as it would amount to attorney testimony about facts not in evidence, a doubly impermissible act. "An attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue *so long as the argument is based on the evidence*." *Owens v. Sec'y, Fla. Dep't of Corr.*, No. 3:16-CV-889-J-39JRK, 2018 WL 1535721, *5 (M.D. Fla. Mar. 29, 2018). Here, for the reasons set forth above, when it comes to the Cox Record, there is no evidence – certainly not the requisite expert evidence – that would permit any such inference, extrapolation, or argument.

### G. Evidence or Arguments About other TCPA Lawsuits or Alleged Violations, Including the Docket Sheets (P-23)

Evidence or arguments about other TCPA lawsuits brought against PMC or about alleged violations of the TCPA, including a composite exhibit of excerpted docket sheets from five lawsuits (Exhibit P-23), should be precluded as well.

"Evidence of other lawsuits is generally considered to be inadmissible hearsay." *A.T.O. Golden Constr. Corp. v. Allied World Ins. Co.*, No. 17-24223-CIV, 2018 WL 5886663, *8 (S.D. Fla. Nov. 9, 2018).[5] The same is true of allegations of

---

[5] *See also*, *e.g.*, *Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 369 n.2 (11th Cir. 2009) (excluding allegations from complaint filed in prior lawsuit against defendant as hearsay); *Johnson*, 988 F.2d at 579; *Roberts v. Harnischfeger Corp.*, 901 F.2d 42, 44-45 (5th Cir. 1989) (affidavit summarizing copies of notices of pending litigation against defendant properly excluded as hearsay); *Amegy Bank Nat'l Ass'n v. DB Private Wealth Mortg., Ltd.*, No. 2:12-cv-243-FtM-38CM, 2014 WL 791505, *2 (M.D. Fla. Feb. 24, 2014) (excluding any "references to allegations, petitions, complaints or claims against [defendant] in other suits" as hearsay); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 2013 WL 1155420, *7 (S.D.N.Y. Mar. 20, 2013) (excluding "[r]eferences to other lawsuits including their factual allegations and evidence").

violations that were not in filed complaints.  Allegations by others against PMC for separate and unrelated TCPA violations – none of which resulted in a judgment against PMC – are also plainly irrelevant to Plaintiff's claims about six (or eight) telephone calls.  Nor do they figure into the issue of whether the TCPA safe harbor under 47 U.S.C. § 227(c)(5)(C) applies.  The FCC issued a regulation identifying what standards must be met to establish that defense, and having been sued or otherwise accused by someone previously is not relevant to any of those standards. *See* 47 C.F.R. 64.1200(c)(2)(i) (identifying the standards regarding national do-not-call rules as having written procedures, training personnel, recording and maintaining a list of telephone numbers not to contact, and purchasing accessing and timely accessing the national do-not-call database).  Whether or not a party has been sued under the TCPA previously will not make the existence of any of those practices more or less probable.

Indeed, the analysis is wholly focused on the particulars of the Plaintiff's alleged violation(s):

> There is no evidence that Efinancial assumed, without reason, that Plaintiff consented to be called. Instead, the evidence reflects that Efinancial's internal processes ensure that it will not receive this information if consent is not first provided. Thus, Efinancial could reasonably believe that Plaintiff submitted the form on its website and consented to be called because it received verified information online which purported to be from and about Plaintiff. . . .
>
> If in fact, the person who submitted the form and consent to be called was a hacker, as Plaintiff suggests, then Efinancial would be understandably mistaken in its belief that Plaintiff had consented to the call. If Plaintiff did not submit the online form – despite all evidence to the contrary – then Efinancial's telephone calls to Plaintiff

were in error.

*     *     *     *     *

> Additionally, Efinancial has provided evidence that, as part of its
> routine business practice, it complies with the standards required by
> the safe harbor provision . . . .

*Johansen I*, 2021 WL 7161969 at *10.

In *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121 (D. Conn. 2016), *aff'd*, 686 F. App'x 48 (2d Cir. 2017), the defendant called the wrong telephone number – plaintiff's – based on a vendor's skip-tracing to try to locate a working number for an existing customer. The court rejected plaintiff's argument "that the skip-tracing at issue in this case is so inherently unreliable that Charter knew it was impermissibly contacting someone on the national DNC call list," because "such a holding would preclude Charter's ability to claim the call was made in error," and, in any event, "those circumstances do not exist in this case." *Id.* at 136. In other words, it did not matter if skip-tracing led to unreliable results in the past.

Moreover, the only evidence for this that Plaintiff lists on her exhibit list is Exhibit P-23, a composite of the first page of docket sheets from ***five*** cases filed in a period from 2014 to 2021. *See* Ex. E. The docket sheets plainly are inadmissible hearsay. Just as with FTC press releases, they do not fall within the public records exception because they contain no "factual findings from a legally authorized investigation . . . ." Fed. R. Evid. 803(8)(A)(iii).

Nor are the docket sheets probative of any relevant fact, certainly not whether PMC's calls to Plaintiff were in violation of the TCPA, let alone willfully or

knowingly, nor the safe harbor defense.  The docket sheets simply recite some basic case information – caption, court, and certain other information submitted by counsel during the creation of the case on the CM/ECF system – about five lawsuits, three of which were filed *after* the telephone calls to Plaintiff in March and April 2020.[6]  Furthermore, the docket sheets do not reveal any information about the allegations and claims in those cases.  In fact, four of the five cases – *Ekwuazi*, *Daschbach*, *Spector*, and *Williams* – alleged violations of only 47 U.S.C. § 227(b) for use of an automatic telephone dialing system or a prerecorded or artificial voice, not subsection 227(c) and the national do-not-call rules, so they can have no probative value whatsoever.  *See* Exs. F-I.  *Emery* is the only case alleging the same claim Plaintiff here alleges, but it was filed months after the calls at issue to Plaintiff so it, too is irrelevant to any alleged knowledge by PMC.

Finally, as the court in *A.T.O. Golden Construction* ruled:

> "[E]ven if [P]laintiff could demonstrate some probative value from allegations in other lawsuits, presenting evidence of these other cases would lead to a series of mini-trials that would likely confuse and mislead the jury from the task at hand of evaluating plaintiff's claims in this case and result in a waste of time and judicial resources." *Smith v. E-backgroundchecks.com, Inc.*, 2015 WL 11233453, at *2 (N.D. Ga. June 4, 2015).  If that was not enough of a reason to grant Defendants' motion, "the minimal value, if any, of such proof is substantially outweighed by the risk of unfair prejudice to [PVGC] arising from the admission of evidence of allegations in other lawsuits filed against it." *Id.* (citing *Rushing v. Wells Fargo Bank, N.A.*, 2012 WL 3155790, at *1 (M.D. Fla. Aug. 3, 2012) (noting that

---

[6] *Ekwuazi* was filed on June 1, 2021 (against a defendant other than PMC), *Daschbach* was filed on June 15, 2020, and *Emery* was filed on August 31, 2020.  That leaves *Williams*, which was filed on February 14, 2020, only weeks before the calls to Plaintiff, and *Spector*, which was filed on September 9, 2014.

generally, "evidence of other lawsuits is not normally relevant and not permitted"); *Williams v. Asplundh Tree Expert Co*., 2006 WL 2868923, at *2 (M.D. Fla. Oct. 6, 2006)). Therefore, Defendants' motion to exclude evidence of prior lawsuits is **GRANTED**.

The same reasoning and result should apply here, too.

## CONCLUSION

For the foregoing reasons, Defendants' Omnibus Motion in *Limine* should be granted in all respects.

Dated:  August 8, 2022                   GREENSPOON MARDER LLP

                                                    */s/ Roy Taub*
                                                    Jeffrey A. Backman (Bar No. 662501)
                                                    Roy Taub (Bar No. 116263)
                                                    200 E. Broward Blvd., Suite 1800
                                                    Ft. Lauderdale, FL  33301
                                                    (954) 491-1120
                                                    jeffrey.backman@gmlaw.com
                                                    khia.joseph@gmlaw.com
                                                    roy.taub@gmlaw.com
                                                    cheryl.cochran@gmlaw.com

                                                    *Attorneys for Defendant*
                                                    *Advanced Marketing & Processing, Inc.*

**CERTIFICATE OF GOOD FAITH CONFERENCE**

In compliance with M.D. Fla. L.R. 3.01(g), I hereby certify that Jeffrey Backman and Roy Taub, counsel for Defendant, conferred in good faith with Jacob Ginsburg, counsel for Plaintiff on August 3 and 4, 2022, by video conference and telephone, respectively, regarding the relief sought herein.   Plaintiff has not confirmed her final positions on certain matters and opposes the instant Motion.

*/s/ Roy Taub*
ROY TAUB

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 8, 2022, a true and correct copy of the foregoing was served on all counsel of record via CM-ECF.

*/s/ Roy Taub*
ROY TAUB